UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PEDRO NIEBLAS,

|  |  |  |
|---|---|---|
|  | Plaintiff, | No. 03-CV-6225 CJS |
| -vs- |  |  |
|  |  | DECISION AND ORDER |
| C.O. RICCI, C.O. NELAN, PATRICIA MILCZARSKI, DIANA WINGFIELD, SERGEANT CRANS, CAPTAIN REYNOLDS, and MELVIN L. WILLIAMS, |  |  |
|  | Defendants. |  |

_____


APPEARANCES

For Plaintiff:          Pedro Nieblas, Pro se
                        1871 Gates Avenue, Apt 1L
                        Ridgewood, NY 11385

For Defendants:         Emil J. Bove, Jr., Esq.
                        Office of the New York State
                        Attorney General
                        144 Exchange Boulevard
                        Rochester, NY 14614


INTRODUCTION

This is an action pursuant to 42 U.S.C. § 1983 in which the plaintiff, Pedro

Nieblas ("Plaintiff"), formerly a parolee enrolled at the Willard Drug Treatment Campus

Facility ("Willard"), alleges that Defendants, all of whom were employed at Willard by the

New York State Department of Correctional Services ("DOCS"), violated his

1

constitutional rights.  Now before the Court are Defendants' summary judgment motions

[#44] [#69].  For the reasons that follow, Defendants' applications are granted, and this

action is dismissed.

BACKGROUND

Unless otherwise noted the following are the facts of this case viewed in the light

most-favorable to the non-moving Plaintiff.  The events at issue in this case occurred at

Willard between November 2002 and February 2003, when Plaintiff agreed to enter the

90-day, boot camp-style drug treatment program, after he failed a drug test given by his

Parole Officer.  At all relevant times, Defendant Melvin L. Williams ("Williams") was the

Superintendent of Willard.  The other Defendants, Corrections Captain David Reynolds

("Reynolds"), Corrections Sergeant David Crans ("Crans"), Corrections Officer Douglas

Ricci ("Ricci"), Corrections Officer Nelan ("Nelan"), Corrections Counselor Patricia

Milczarski ("Milczarski"), and Parole Officer Diana Wingfield ("Wingfield") were also

employed at Willard in the capacities indicated by their respective titles.

At Willard, parolees "receive approximately 90 days of: assessment; intensive

residential alcohol and substance abuse treatment[;] education; drill consisting of

rigorous physical activity, intensive regimentation and discipline[;] rehabilitation therapy;

and other programming." (Affidavit of David Reynolds ¶ 5).  During his first two weeks at

Willard, Plaintiff received written reprimands, known as "Case Memorandums," from four

separate staff members, for conduct such as talking back to staff and otherwise being

disrespectful. (Ricci Aff. ¶ 7).[1]  On or about November 25, 2002, Plaintiff filed a

---

[1]As will be discussed further below, in opposition to Defendants' summary judgment motions, Plaintiff denies, in conclusory fashion, that he "misbehave[d] or br[oke] any program rules." (Plaintiff Declaration ¶ 26).

grievance against Ricci, which was denied.  Subsequently, Milczarski prepared weekly evaluations of Plaintiff's performance, some of which were based on her personal knowledge and some of which were based on information that she obtained from staff members who worked directly with Plaintiff during that time.[2]  Plaintiff's monthly evaluations were primarily unfavorable, and during the month of December 2003 he received negative reports from multiple staff members, including defendants Ricci and Nelan, as well as several non-defendants including Counselor D. Stone, Counselor Pastik, Counselor G. Zook and Parole Officer Montalto. (Milczarski Affidavit ¶ 7).  As a result of Plaintiff's poor performance, Milczarski referred Plaintiff to Willard's Evaluation Review Committee ("ERC"), which determined that Plaintiff would have to re-start the program.[3]  Consequently, Plaintiff was reassigned to a new platoon (B-1).  Apparently, Plaintiff had no contact with Ricci, Milczarski, or Nelan after he was transferred to B-1 Platoon.

Upon Plaintiff's transfer to B-1 Platoon, Wingfield became his supervisor.  During the month of January 2003, Plaintiff completed a number of required writing assignments for Wingfield, and failed to complete others. (Wingfield Affidavit ¶ ¶ 7-8).  He also continued to receive written reprimands from staff.[4]  On or about February 3,

---

[2]Milczarski did not personally observe Plaintiff during at least one of those weeks.  Plaintiff contends that Milczarski's evaluations were necessarily "false," since she did not personally work with Plaintiff during that time, however, he has produced no evidence to dispute Milczarski's explanation of the basis for her reports.

[3]Apparently as a result of having to re-start the program, Plaintiff was required to remain in Willard's program an additional 35 days. (Complaint [#1]  at ¶ 70).

[4]For example, on January 17, 2003, Sergeant T.J. Sirois wrote that Plaintiff did "not support peers.  Talks during community meetings disturbing the process.  Disrespectful towards staff.  Cheats on corrective exercises assigned by Sgt. Sirois.  Shows no growth or progress in program."

2003, Plaintiff failed to appear for a scheduled meeting with Wingfield. (*Id*. at ¶ 8).  On February 10, 2003, Wingfield met with Plaintiff, and observed that he had a large amount of typing paper in his binder that he was not authorized to possess.  When Wingfield asked Plaintiff where he had gotten the paper, he gave inconsistent statements. (*Id*.).  Wingfield wrote a misbehavior report against Plantiff, charging him with false statements, contraband, and stealing state property, and also referred him to the ERC.

On February 12, 2003, Plaintiff approached Wingfield and asked her to allow him to withdraw from the Willard program. (*Id*. at 9).  When Wingfield told Plaintiff that she had already referred him to the ERC, Plaintiff responded that he was going to sue her, and take her house, car, and everything else.  (*Id*.).  Plaintiff also began yelling that Wingfield was "killing him," and that she was giving him a "heart attack." (*Id*.).  As a result, Wingfield issued a misbehavior report, charging Plaintiff with making threats and causing a disturbance. (*Id*. at ¶ 10).  Subsequently, Plaintiff was found guilty of the misbehavior report.  Additionally, the ERC removed Plaintiff from the Willard program based on his poor performance.  Consequently, Plaintiff was removed from the program, and charged with a parole violation for failing to complete the program.  (*Id*.).

On March 4, 2003, Plaintiff appeared before the New York State Division of Parole for a Preliminary Parole Hearing.  At the hearing, Plaintiff testified under oath that he was able to speak, read, and understand English. (Transcript of Preliminary Parole Hearing at 5).  Moreover, the hearing transcript clearly indicates that Plaintiff has no difficulty speaking or understanding English.  On April 9, 2003, Plaintiff appeared at his Final Parole Hearing, and again testified under oath, stating that the reason he left the

4

Willard Program was because it was too stressful for him.  (*See, e.g.*, Transcript of Final

Parole Hearing at 6).  Notably, Plaintiff testified that he left voluntarily, and was not

removed from the program. (*Id*. at 8) ("I wasn't removed."); (*See also, Id*. at 8-9)

(Plaintiff's counsel explained to the Administrative Law Judge: "Simply, my client

explains to me although he does have some psychiatric difficulties, basically, he signed

out.  It was too stressful. . . .  He chose on his own to terminate his relationship with

Willard and to seek a different avenue.").  Specifically, Plaintiff testified, in relevant part,

as follows:

> Willard is a stressful program.  Very stressful program.   . . . [S]ome people
> cannot handle it.  The problem is I'm one of the people who cannot handle
> it.  Okay.  While in Willard, I went through a lot of stressful situations.  A
> lot.  That situations therefore a normal person or strong-minded person
> they would have been able to handle it [sic].  Definitely, I could not handle
> it.   The last month – my last month at Willard was [a] real bad month for
> me.  I was real agitated.  I was confused.  I didn't know what to do.  My
> disciplinary hearing record at Willard, my disciplinary violation, I could not
> pass no evals.  I tried real hard.
>
> I went through a lot of problems.  People thought in Willard I was
> rebellious.  I was trying to fight the program.  I wasn't trying to fight the
> program.  The program, I could not handle it. . . .  The last couple of days
> in Willard, you know, I was in so many problems.  I could not even sleep
> the last week.  I got into problems with the leader of the Bloods [gang] in
> the facility.  You know, that's crazy.
>
> I'm [a] 47-years-old man [sic].  Getting into trouble with a 27-years-old
> gang member only a crazy guy [would] do that.  I went into the problem
> without even thinking.  February 12 – we go to February 12.  My parole
> officer [Wingfield] write me a misbehavior report.  She write at one point I
> was really agitated.  Really confused.  I was blaming that on her for
> everything that was happening to me.  That day about six o'clock in the
> afternoon I requested protective custody because I wasn't – I could not –
> truthfully, I as thinking about killing myself.
>                                   ***
> Eight o'clock I had [an] argument with my parole officer [Wingfield].  Still
> today I don't know why.  Because they didn't make no sense.  She didn't
> do nothing to me.  I believe I didn't do nothing to her, but she didn't say

nothing to me.

(*Id*. at 19-21).

Subsequent to his Final Parole Hearing, Plaintiff wrote a letter to the

Administrative Law Judge, in which he stated, in relevant part:

> My last few weeks at Willard were a nightmare.  I could not handle the
> stress.  As a result, I started acting out of character, arguing with my peers
> and not following directions that caused my removal from the program.
> However, I don't believe that I was responsible for the deterioration of my
> mental state.  While at Willard, more specifically on February 12, 2003, I
> suffered some kind of nervous breakdown or psychotic episode.  I felt like
> the whole world came crashing down on me and [I] started acting out of
> character, yelling and screaming at people, threatening with killing myself if
> I was not taken out of there.

(April 18, 2003 Letter to Administrative Law Judge).

On January 31, 2003, prior to testifying in the parole hearings as described

above, Plaintiff commenced the instant action.  Plaintiff is asserting two types of claims

under Section 1983.[5]  First, he alleges that Defendants retaliated against him for filing

inmate grievances, in violation of his First Amendment rights. (*See* Decision and Order

[#3] at 9).  And second, Plaintiff, who is Black and Cuban, alleges that Defendants

violated his Fourteenth Amendment equal protection rights by: 1) conducting the Willard

drug treatment program in English; 2) targeting him for discipline because of his race;

and 3) enforcing facility policies in a manner that adversely impacted him as compared

to White, English-Speaking inmates. (*Id*. at 10).

With regard to the retaliation claim, Plaintiff alleges that Defendants retaliated

against him in various ways after he filed grievances.  He states that Nelan verbally

---

[5]Plaintiff originally asserted several other claims, however, they were dismissed. *See*, Decision
and Order [#3].

"berated" him for filing grievances, threatened him with "reprisals," and mocked him. (Complaint [#1] ¶ ¶ 56-58).  He contends that Milczarski referred him to the ERC, "to get him re-started in the program," based on fabricated negative evaluation reports. (*Id*. at ¶ ¶ 60-62).  Further, he alleges that Wingfield retaliated against him by yelling at him, applying "psychological pressure" against him, giving him poor evaluations, insulting him, and writing a misbehavior report against him. (*Id*. at ¶ ¶ 73-76).[6]

He also indicates in his sworn Complaint that he was removed from the Willard Program as a result of Wingfield's misbehavior report. (*Id*. at 93).  However, earlier in his Complaint he alleges that he was removed from the Willard program after he suffered a "nervous breakdown," and threatened to start a fight if he was not removed from his housing unit : "Plaintiff just snapped, He started acting out of character, yelling and screaming to everybody including defendant Wingfield, and threatened with starting a fight if he was not taken out of that housing unit and away from defendant Wingfield." (*Id*. at ¶ 77).[7]

Finally, Plaintiff alleges, in conclusory fashion, that Williams, Reynolds, Crans, Nelan, Ricci, Milczarski, and Wingfield retaliated against him by conspiring to cause him to have a nervous breakdown. (*Id*. at ¶ 77).  Basically, in this action Plaintiff denies that he did anything wrong at Willard, and that all of the misbehavior reports and negative evaluations that he received were therefore false. (Plaintiff's Declaration [#54] ¶ 26)

---

[6]Plaintiff contends that Wingfield issued the misbehavior report after he threatened to sue her. (*Id*. at ¶ 91).  Plaintiff was found guilty of the charge, and sentenced to 15 days loss of recreation, packages, phone, and commissary privileges. (*Id*. at ¶ 92).

[7]Although Plaintiff alleged that Defendants were responsible for causing his nervous breakdown, that claim was dismissed. (See, Order [#3] at 5-7).

7

("Contrary to defendants' affidavits, during said incidents, your plaintiff even though he was [going] through a very difficult time, did not threaten the defendants in any fashion, misbehave or break any program rules that would have justif[ied] such actions on the defendants['s part] such as writ[ing] false reports.").

As for his equal protection claims, Plaintiff alleges that Willard's "rules and practices" discriminated against him, because the facilities' programs were conducted in English, without an interpreter. (*Id*. at ¶ ¶ 86-88).   Plaintiff suggests that Willard's "English only" policy is an "unwritten rule," for which Williams is responsible.  Plaintiff further contends that Wingfield required him to translate certain assignments, which he had completed in Spanish, into English. (*Id*. at ¶ 89).  Additionally, Plaintiff alleges, in conclusory fashion, that all Defendants engaged in "racist behavior." (*Id*.).   Plaintiff also asserts, in conclusory fashion, that defendants engaged in "discrimination" against Spanish speaking inmates, which resulted in them having to remain in Willard's program longer than English speaking inmates. (*Id*. at ¶ 90).  However, Plaintiff does not claim to be unable to speak or understand English generally, but at most, alleges that Nelan mocked him when "he could not understand [Nelan's] instructions in English." (Plaintiff's Declaration [#54] ¶ 19).[8]  Moreover, the record indicates that during his brief stay at Willard, Plaintiff filed numerous complaints and grievances, all of which were clearly and well-written in English.  Nowhere in those grievances does Plaintiff claim to be unable to speak, write or understand English.

On April 6, 2004, all defendants except Crans, who had not yet been served,

---

[8]In his *unsworn* memo of law, Plaintiff states that he can speak only "some English," and "can understand simple commands in the English language." (Plaintiff's Memo of Law [#55] at 7).

moved for summary judgment [#44], and Plaintiff filed a response.  Subsequently, Crans
was made a party to the action, and on June 28, 2007, he filed a summary judgment
motion [#69], to which Plaintiff also responded.[9]

The Court, having reviewed the parties submissions and the entire record in this
case, now grants summary judgment to Defendants.

## DISCUSSION

The standard for granting summary judgment is well established.  Summary
judgment may not be granted unless "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the moving party is entitled to
a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment
bears the burden of establishing that no genuine issue of material fact exists. *See,
Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a
prima facie showing that the standard for obtaining summary judgment has been
satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In
moving for summary judgment against a party who will bear the ultimate burden of proof
at trial, the movant may satisfy this burden by pointing to an absence of evidence to
support an essential element of the nonmoving party's claim." *Gummo v. Village of
Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317,
322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts

---

[9]Defendants provided the *pro se* Plaintiff with the *Irby* notice required by Local Rule 56.2.

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To do this, the non-moving party must

present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at

249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made

and supported as provided in this rule, and adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response,

by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine issue for trial.").  Summary judgment is appropriate only where,

"after drawing all reasonable inferences in favor of the party against whom summary

judgment is sought, no reasonable trier of fact could find in favor of the non-moving

party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).  The parties may only carry

their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV.

P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and

depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v.

Diebold, Inc.*, 369 U.S. 654, 655 (1962).

However, the party opposing summary judgment may not create a triable issue of

fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule

v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted).  Rather, such

affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.

1987)(citations omitted).

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles applicable

to such claims are well settled:

In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).

***

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

With regard to Plaintiff's First Amendment retaliation claim, the applicable legal principles are clear:

Courts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.  Thus, . . . a plaintiff asserting First Amendment retaliation claims must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.

*Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citations and internal quotation marks omitted).  The filing of prison grievances is protected speech. *Id*.  With regard to the alleged adverse action, it is clear that

> [o]nly retaliatory conduct that would deter a similarly situated individual of
> ordinary firmness from exercising his or her constitutional rights constitutes
> an adverse action for a claim of retaliation.  Otherwise the retaliatory act is
> simply de minimis and therefore outside the ambit of constitutional
> protection.  In making this determination, the court's inquiry must be tailored
> to the different circumstances in which retaliation claims arise, bearing in
> mind that prisoners may be required to tolerate more than average citizens,
> before a retaliatory action taken against them is considered adverse.
>
> ***
>
> Insulting or disrespectful comments directed at an inmate generally do not
> rise to this level.

*Id*. at 353 (citations and internal quotation marks omitted).  Moreover, "[i]n order to satisfy the causation requirement, allegations must be sufficient to support the inference that the [protected] speech played a substantial part in the adverse action." *Id*. at 354 (citation and internal quotation marks omitted).

Assuming that the plaintiff establishes a prima facie case of retaliation, the defendant may nevertheless prevail if he can demonstrate that he would have taken the adverse action anyway:

> The plaintiff bears the burden of showing that the conduct at issue was
> constitutionally protected and that the protected conduct was a substantial
> or motivating factor in the prison officials' decision to discipline the plaintiff.
> If the plaintiff carries that burden, the defendants must show by a
> preponderance of the evidence that they would have disciplined the plaintiff
> even in the absence of the protected conduct.  Thus, if taken for both
> proper and improper reasons, state action may be upheld if the action
> would have been taken based on the proper reasons alone.

*Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations and internal quotation marks omitted).

With regard to Plaintiff's equal protection claim, the applicable legal principles are similarly well settled:

> To prove a violation of the Equal Protection Clause . . . a plaintiff must
> demonstrate that he was treated differently than others similarly situated as
> a result of intentional or purposeful discrimination.  He also must show that

12

> the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests.

*Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citations and internal quotation marks omitted).

In applying these principles of law, the Court recognizes, since Plaintiff is proceeding *pro se*, that it is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994). Having done so, the Court nevertheless finds that Defendants are entitled to summary judgment.

At the outset, Plaintiff contends that the Court cannot grant summary judgment because discovery has not been completed. Specifically, he states that he filed a motion to compel that was never ruled upon by the Court. (Plaintiff's Declaration ¶ 4). However, Plaintiff is incorrect, since on September 19, 2006, the Honorable Jonathan W. Feldman, United States Magistrate Judge, denied the motion to compel. (Order [#61]).

Turning to Plaintiff's First Amendment Retaliation claim, the Court finds, first, that Plaintiff has not demonstrated a prima facie case. For example, the alleged retaliation consisting of verbal harassment is *de minimis*. Moreover, even assuming, *arguendo*, that the alleged retaliation consisting of written misbehavior reports and the termination of Plaintiff from the program was sufficiently severe, Plaintiff has not produced evidence that those actions were causally connected to his grievances. To the contrary, Plaintiff's own sworn testimony at his Parole Hearing indicates that he failed to pass his evaluations and engaged in misbehavior, and that he voluntarily withdrew from Willard

13

due to stress.  Further, even if Plaintiff could establish a prima facie case, it appears

clear, from the entire record, including his own sworn testimony and the evidence of

misbehavior reports written by non-defendants, that the same actions would have been

taken against him in the absence of the alleged retaliation.  Plaintiff has produced no

evidentiary proof in admissible form to the contrary.  On this point, Plaintiff's conclusory

statement that he "did nothing wrong," filed in opposition to the summary judgment

motions, is insufficient to create a triable issue of fact. *See, Shannon v. New York City

Transit Authority*, 332 F.3d 95, 99 (2d Cir. 2003) ("[T]he nonmoving party must come

forward with specific facts showing that there is a genuine issue of material fact for trial.

Conclusory allegations, conjecture, and speculation are insufficient to create a genuine

issue of fact.") (citations and internal quotation marks omitted).  Consequently,

Defendants are entitled to summary judgment on the retaliation claims.

Plaintiff's equal protection claim similarly fails, most notably because the record

clearly indicates that Plaintiff had no difficulty speaking, reading, writing, or

understanding English.  To the extent that Plaintiff is claiming otherwise, such claim is

contradicted by his earlier sworn testimony.  Nor has Plaintiff come forward with

evidentiary proof in admissible form to support his claim that he was treated differently

than others similarly situated as a result of intentional or purposeful discrimination.

## CONCLUSION

Defendants' applications for summary judgment [#44] [#69] are granted, and this

action is dismissed with prejudice.  Further, the Court certifies, pursuant to 28 U.S.C. §

1915(a)(3), that any appeal from this Order would not be taken in good faith and leave

to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United*

*States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis*

should be directed on motion to the United States Court of Appeals for the Second

Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

     So Ordered.

Dated: Rochester, New York
     January 16, 2008

                    ENTER:


                    /s/ Charles J. Siragusa
                    CHARLES J. SIRAGUSA
                    United States District Judge

15